# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RICHARD A. SHULTZ** | : | **No. 1:08cv1896** |
| **Plaintiff,** | : | |
| | : | **(Judge Munley)** |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CARLISLE POLICE DEPARTMENT;** | : | |
| **CORPORAL WILLIAM D. MILLER;** | : | |
| **OFFICER JEFFRY KURTZ;** | : | |
| **UNKNOWN OFFICERS AND** | : | |
| **AGENTS; and** | : | |
| **THE BOROUGH OF CARLISLE,** | : | |
| **Defendants** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Before the court is defendants' motion for summary judgment (Doc. 17).

Having been fully briefed and argued, the matter is ripe for disposition.

## Background

This case arises out of an incident between plaintiff and officers of the Carlisle,

Pennsylvania police department. At approximately 6 p.m. on October 20, 2006,

Plaintiff Richard Shultz suffered a seizure while visiting a McDonald's restaurant

located in a Wal-Mart in Carlisle, Pennsylvania. (Defendants' Statement of Material

Facts (Doc. 18) (hereinafter "Defendants' Statement") at ¶ 1).[1]  Wal-Mart patrons

---

[1]The court will rely on the defendants' statement of material facts for those items
which are uncontested.  The court will note where the parties disagree about a material
fact.

called for emergency medical assistance and a police dispatcher reported that plaintiff was suffering a seizure or possibly intoxicated. (Id. at ¶ 2). Defendant Corporal William Miller of the Carlisle Police Department arrived at the Wal-Mart shortly thereafter. (Id. at ¶ 3). Corporal Miller had heard a radio dispatch reporting that Defendant Officer Jeffrey Kurtz was responding to the scene and that a person at the Wal-Mart was experiencing a seizure or was intoxicated. (Id.). The parties dispute whether the McDonald's was busy when Miller arrived. (Defendants' Statement at ¶ 4; Plaintiff's Counterstatement of Material Facts (Doc. 24) (hereinafter "Plaintiff's Statement") at ¶ 4). Miller testified that around twenty-five people were in the restaurant when he got there, and that these people were evenly distributed between two areas in the restaurant. (Plaintiff's Statement at ¶ 4). Miller saw plaintiff sitting at a McDonald's table staring straight ahead. (Defendants' Statement at ¶ 4).

Included in the case file is a DVD of surveillance footage from the McDonald's. (Id. at ¶ 5). One piece of footage, taken from behind the counter at the McDonald's, shows plaintiff standing in line, swaying slightly, and falling to the ground. (Id.). Video shot by another camera shows personnel, presumably from McDonald's and Wal-Mart, speaking with the plaintiff. (Id. at ¶ 6). The parties disagree about the contents of this conversation. (Id. at ¶ 6; Plaintiff's Statement at ¶ 6). Defendants contend that store employees attempted for several minutes to obtain information from plaintiff, but that he failed to respond. (Id. at ¶ 6). Plaintiff insists that

2

defendants have produced no evidence about plaintiff's conversation with these people. (Plaintiff's statement at ¶ 6).

Defendant Miller, upon arriving at the McDonald's, approached plaintiff while he was seated at the table and began speaking with him. (Id. at ¶ 7). He asked plaintiff questions about who he was, where he lived, and how he felt. (Id.). Plaintiff was largely unresponsive, mostly repeated that he was "fine." (Id.). The parties dispute whether Miller remained calm and quiet while speaking to plaitniff. (Id.; Plaintiff's Statement at ¶ 7). Plaintiff contends that Miller allowed a growing crowd to surround him, and that this action "potentially removed" any calm defendant had created. (Id.). Defendant Detective Kurtz, who was the next officer on the scene, appeared shortly after Miller did. (Defendants' Statement at ¶ 8). He stood back to cover Miller while Miller talked to plaintiff. (Id.).

Emergency Medical Services ("EMS") were also dispatched to the Wal-Mart and McDonald's. (Id. at ¶ 9). They arrived while Miller was speaking with plaintiff. (Id.). One EMS worker attempted to persuade plaintiff to go to the hospital. (Id.). Defendants contend that plaintiff refused to do so and became agitated. (Id.). Plaintiff disputes this, pointing out that Defendant Miller testified that plaintiff was more cooperative while he spoke with the ambulance crew. (Plaintiff's Statement at ¶ 9). Miller testified that he had been informed by EMS workers that plaintiff needed to go to the hospital for immediate medical attention. (Defendants' Statement at ¶ 12). Plaintiff insists that defendants lack evidence of this claim, since they have not

3

provided any sworn statements from EMS personnel about the incident. (Plaintiff's Statement at ¶ 12).

The parties dispute the amount of time that personnel on the scene attempted to reason with plaintiff. (Defendants' Statement at ¶ 10; Plaintiff's Statement at ¶ 10). Defendants contend that store personnel, Corporal Miller and EMS attempted to convince plaintiff to seek medical treatment for nearly twenty minutes before the incident at question here occurred. (Defendants' Statement at ¶ 10). Plaintiff, citing to the DVD of the incident, insists that the incident occurred slightly more than six minutes after Miller arrived on the scene, and only two minutes after EMS workers brought a gurnery into the restaurant. (Plaintiff's Statement at ¶ 10). Defendant Miller, plaintiff contends, used a Taser on plaintiff around thirty seconds later. (Id.).

Whatever the length of this conversation, at some point plaintiff got up from his chair and pushed aside a gurney, which EMS workers had placed next to his table. (Defendants' Statement at ¶ 13). He began moving towards the McDonald's exit. (Id.). Plaintiff disputes that the DVD of the incident shows him shoving aside the gurney, or that he was anywhere near the exit when he got up. (Plaintiff's Statement at ¶ 13). In any case, plaintiff insists, he was unconscious and could not form an intent to push anything. (Id. at ¶14). Corporal Miller and Detective Kurtz moved immediately to contain plaintiff. (Defendants' Statement at ¶ 13). They contend that they gave him verbal commands in an attempt to get him to comply with their request to get on the gurney and go to the hospital. (Id. at ¶ 14). Plaintiff

4

insists that the videotapes demonstrate that there was no time for officers to give him a verbal warning before they placed their hands on him. (Plaintiff's Statement at ¶ 14).

Defendants contend that officers attempted to move plaintiff and force him onto the gurney, but that he resisted. (Defendants' Statement at ¶ 15). Plaintiff interprets the evidence from the videotapes to demonstrate that officers wrestled plaintiff to the ground almost immediately after he stood up. (Plaintiff's Statement at ¶ 15). Corporal Miller and Detective Kurtz insist that they warned defendant repeatedly that he would be forced onto the gurney if he did not comply. (Defendants' Statement at ¶ 16). Only after he refused these requests, they claim, did they attempt to move him physically. (Id.). The three men soon began wrestling. (Id. at ¶ 17). During this wrestling, Corporal Miller used his Taser, a device that delivers short electrical bursts as a means of subduing and controlling suspects, against the plaintiff. (Id.). Miller used the device six times. (Id. at ¶ 19). After this sixth Taser discharge, Miller and Kurtz handcuffed the plaintiff. (Id. at ¶ 20). EMS personnel then transported plaintiff to the Carlisle Regional Medical Center. (Id. at ¶ 21). He was treated and released. (Id.).

Plaintiff points to various pieces of evidence to contest defendants' version of this altercation. Pointing to Defendant Miller's Use of Force Report, executed after the incident, plaintiff insists that the only command Miller gave plaintiff was a warning that if he did not comply he would be tasered. (Plaintiff's Statement at ¶ 16).

Plaintiff responded, Miller reported, with only a blank stare.  (Id.).  Plaintiff insists that the video of the incident does not reveal Miller's intent in using the Taser, and that his purpose was punitive.  (Id.).  Though plaintiff contests the accuracy of the Taser International report of Miller's use of that device, plaintiff contends that the amount of time between Miller's applications of force was too small to support his claim that he used the device only after assessing the situation to see if plaintiff had complied.  (Id. at ¶ 18; Defendants' Statement at ¶ 18).

Plaintiff does not recall any of the events that led to the incident or of the incident itself.  (Defendant's Statement at ¶¶ 11; 22).  He was not wearing any sort of a medical bracelet at the time of the incident.  (Id. at ¶ 23).  Defendant Miller testified that he did not check for such a bracelet at the time of the incident.  (Plaintiff's Statement at ¶ 23).

The parties disagree about the injuries plaintiff suffered from the incident. Defendants contend that plaintiff alleged only that he suffered a small bruise on his lower back and a series of small red marks made by the application of the Taser. (Defendants' Statement at ¶ 24).  Moreover, they claim, plaintiff admitted that the bruise to his back was in the same portion of his back that struck the flooring during his seizure at the McDonald's.  (Id. at ¶ 25).  Plaintiff describes his injuries as a burn and bruise to his back caused by the Taser, a bruise on his head, bruises and pain from the handcuffs, emotional injuries from humiliation and embarrassment, and constitutional injuries.  (Plaintiff's Statement at ¶ 24).  As evidence of his injuries,

plaintiff points to pictures taken four days after the incident that show bruising on his wrist and back consistent with handcuffs and Tasers.  (Id. at ¶ 26).

Plaintiff filed the instant complaint on October 15, 2008.  The complaint contains six counts.  Count I, brought pursuant to 42 U.S.C. § 1983, alleges that defendants Miller and Kurtz used excessive force in subduing plaintiff in violation of his Fourth Amendment rights.  Count II is a state-law claim of assault against the defendants.   Count III is a state-law battery claim.  Count IV alleges intentional infliction of emotional distress against the defendants.  Count V raises a failure-to-train claim against the Borough of Carlisle.  Count VI alleges that the defendants violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, in their treatment of plaintiff.

The defendants answered the complaint.  (Doc. 7).  After the parties conducted discovery, defendants filed the instant motion.  The parties briefed the issue, and the court held oral argument, bringing the case to its present posture.

**Jurisdiction**

As the plaintiff brings causes of action pursuant to 42 U.S.C. § 1983 and other federal statutes, the court has jurisdiction pursuant to 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").   The court has supplemental jurisdiction over plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a) ("In any civil action of which the district courts have original jurisdiction, the district courts shall have

supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article II of the United States Constitution.").

**Legal Standard**

The case is before the court on defendants' motion for summary judgment. Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. International Raw Materials, Ltd. v. Stauffer Chemical Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. Anderson, 477 U.S. at 248 (1986). A fact is material when it might affect the outcome of the suit under the governing law. Id. Where the non-moving party will bear the burden of

8

proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex v. Catrett, 477 U.S. 317, 322 (1986).

**Discussion**

Defendants seek summary judgment on each of the plaintiff's claims. The court will address each in turn.

### A. Excessive Force

Defendants argue that they should receive summary judgment on plaintiff's claim that officers used excessive force in taking him into custody in violation of his Fourth Amendment rights. "[A] free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person . . . [is] properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." Graham v. Connor, 490 U.S. 386, 388 (1986). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion of the individual's Fourth Amendment interests'" against the countervailing governmental interests at take." Id. at 396 (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985)). To evaluate whether force was excessive, the "court must determine the objective 'reasonableness' of the challenged conduct, considering 'the severity of the crime at issue, whether the suspect poses an

immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." <u>Couden v. Duffy</u>, 446 F.3d 483, 497 (3d Cir. 2006) (quoting <u>Carswell v. Borough of Homestead</u>, 381 F.3d 235, 240 (3d Cir. 2004)). Among other factors considered by the court are "'the duration of the [officer's] action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.'" <u>Id.</u> (quoting <u>Sharrar v. Felsing</u>, 128 F.3d 810, 822 (3d Cir. 1997)). Because police officers must often make split-second decisions in tense situations, courts consider events from "'the perspective of a reasonable officer on the scene.'" <u>Id.</u> (quoting <u>Graham</u>, 490 U.S. at 397).

Defendants argue that their actions were reasonable in the situation, since plaintiff was resisting their efforts to aid him and get him to a hospital where he could receive medical treatment. Police needed to subdue and restrain plaintiff to get him the aid he needed. The use of limited force under those circumstances, defendants contend, could not be seen by a reasonable juror as excessive.

Plaintiff has no recollection of the incident. He argues, however, that footage from surveillance cameras located in the McDonald's that recorded the incident in question create a question of fact as to the reasonableness of the officers' actions. (<u>See</u> Exh. R to Defendants' Statement). The three videos are shot from two different angles, one from behind the counter and the other in the dining area. (<u>Id.</u>). A

videotape from behind the counter shows plaintiff's initial seizure while waiting in line. (Id.). Plaintiff collapses on the floor, shaking. (Id.). He receives some assistance from other customers and eventually gets back on his feet. (Id.). According to the time-stamp on the video, plaintiff begins to sway on his feet at around 6:32:18 p.m. on October 20, 2006. (Id.). He collapses at 6:32:35. (Id.). Plaintiff lies in a carpeted area, shaking and convulsing, until approximately 6:33:25, when he appears to sit up. (Id.). At 6:34:39, plaintiff rises to his feet. (Id.).

Another video shows plaintiff sitting in the dining area after his seizure. (Id.). Plaintiff first appears in the picture at 6:36:35, walking from the counter area to the dining area. (Id.). He walks to a table and sits down in a chair at 6:36:48. (Id.). At 6:37:16 a store security official arrives, leans over plaintiff's table, and begins talking with him. (Id.). Another security official arrives shortly thereafter. (Id.). These officials continue to speak with plaintiff for the next few minutes. (Id.). At 6:46:10, a police officer, apparently Corporal Miller, appears on the videotape. (Id.). Around forty seconds later a plainclothes officer dressed in jeans and a sweatshirt with his badge hanging around his neck, apparently Detective Kurtz, arrives. (Id.). An emergency medical technician (EMT) appears at 6:47:45. (Id.). These officers discuss the situation with each other and mall security for around a minute, and then the EMT leans in to speak with the plaintiff. (Id.). Another EMT appears pushing a gurney at 6:48:22. (Id.). He leaves the gurney in a corner near the counter. (Id.). After speaking with other personnel, at 6:50:06, this EMT retrieves the gurney and

11

pushes it next to plaintiff's table.  (Id.).  Assisted by Corporal Miller, he lowers the

gurney and prepares it to receive plaintiff.  (Id.).

At 6:50:35 an EMT turns to plaintiff and begins speaking to him.  (Id.).

Corporal Miller likewise leans over plaintiff and begins to speak to him at 6:50: 51.

(Id.).  Various personnel continue speaking with plaintiff until 6:51:51, when he

stands up.  (Id.).  Plaintiff attempts to push the gurney out of his way and walks past

the officer standing closest to him.  (Id.).  Miller and Kurtz then coverage on plaintiff

and some sort of struggle occurs.  (Id.).  The officers wrestle plaintiff into a corner at

the front of the store.  (Id.).  There, Miller uses the Taser on plaintiff several times.

(Id.).  Miller eventually handcuffs plaintiff and places him on the gurney.  (Id.).  The

struggle between the two officers and plaintiff lasted approximately 4 minutes and 20

seconds.  (Id.).

A jury could conclude from these videotapes that police used excessive force

in taking plaintiff into custody.  While plaintiff certainly appears to have resisted

defendants' attempts to place him on the gurney, a jury could also conclude that the

tape demonstrates that plaintiff was not a danger to anyone and did not pose a

threat to the police officers' safety.  During most of the recording he sits docilely

while numerous officers and other personnel speak with him.  Moreover, Corporal

Miller and Detective Kurtz appear to have plaintiff under their control at the time that

Miller uses his Taser repeatedly on plaintiff.  While a jury may conclude that

defendants' behavior was reasonable under the circumstances, a jury could also find

12

that the force used was unreasonable.[2]

Plaintiff has also produced the expert report of Criminologist R. Paul McCauley, PhD. (See Report of R. Paul McCauley, Exh. A to Plaintiff's Brief in Opposition (Doc. 24) (hereinafter "McCauley Report")). McCauley is a professor of criminology and former head of the Criminology Department at Indiana University of Pennsylvania. (Id. at 1). He was also formerly a municipal police officer in Pennsylvania and has taught procedures for arrest, handcuffing, transportation and processing to other officers. McCauley is a certified police instructor in Pennsylvania, Kentucky and Florida. McCauley's report examines the events of October 20, 2006 and the actions of police officers in attempting to assist plaintiff, who was ill but had committed no crime. Noting that plaintiff was behaving in an incoherent, semi-conscious, but not violent, fashion, McCauley finds that police could have waited for him to recover or more gently attempted to convince him to get on a gurney. They should have addressed him in a calm and reasoned manner, rather than with force. Instead, officers quickly used physical force and then escalated to the use of a Taser to gain control. Under the circumstances, McCauley

---

[2]At oral argument, defense counsel pointed out that the videos contain no sound and that they require interpretation from witnesses on the scene to explain them. The court agrees, but notes that the videos may become more or less beneficial to the plaintiff after this testimony. The need for testimony to explain them demonstrates why they create a question of fact. To put the point in the language of contemporary cultural scholars, "the photograph, as it stands alone, presents merely the *possibility* of meaning. Only by its embeddedness in a concrete discourse situation can the photograph yield a clear semantic outcome." Alan Sekula, "On the Invention of Photographic Meaning" in Victor Burgin, ed., THINKING PHOTOGRAPHY (London, 1988) at 91.

finds, such actions were "unreasonable, unnecessary, and excessive force." (Id. at 16).

McCauley's report provides more evidence by which a jury could conclude that the circumstances did not reasonably require the force defendants used. The court thus finds that the evidence of record precludes summary judgment on this claim. Plaintiff has produced evidence by which a jury could conclude that defendants' use of force against plaintiff was unreasonable under the circumstances. The court will therefore deny defendants' motion on this claim.

### B. Qualified Immunity

Defendants contend that even if a jury decided that their actions violated plaintiff's constitutional rights they should be entitled to qualified immunity and granted summary judgment. Here, where the officers acted to restrain a person resisting their control in a public place, the officers' actions did not violate any clearly established right and cannot be the subject of liability.

"Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Determining whether qualified immunity applies is a two-step process: "First, the court must determine whether the facts alleged show that the defendant's conduct violated a constitutional or statutory right." Williams v. Bitner, 455 F.3d 186, 190 (3d Cir.

14

2006).    If a court finds that a defendant violated a constitutional or statutory right, then "the court must determine whether the constitutional or statutory right allegedly violated by the defendant was 'clearly established.'" Id.; see also Doe v. County of Centre, 242 F.3d 437, 454 (3d Cir. 2001) (defining test as "(1) whether the plaintiffs alleged a violation of their statutory or constitutional rights; (2) whether the right alleged to have been violated was clearly established in the existing law at the time of the violation; and (3) whether a reasonable official should have known that the alleged action violated the plaintiff's rights.").    A right is clearly established when its meaning is "sufficiently clear that a reasonable official would understand what he is doing violates that right."    Saucier v. Katz, 533 U.S. 194, 202 (2001).    Mistakes about the governing legal standard can be evidence that the right is not clearly established: "qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted."    Brosseau v. Haugen, 543 U.S. 194, 198 (2004); see also Shea v. Smith, 966 F.2d 127, 130 (finding that "if the law at that time was not clearly established, an official could not reasonably be expected to 'know' that the law forbade conduct not previously identified as unlawful.").

Defendants cite to Everson v. Leis, 556 F.3d 484 (6th Cir. 2009), to argue that officers are entitled to qualified immunity in cases where they act forcefully to subdue a suspect experiencing an epileptic seizure.    In Everson, the plaintiff suffered an epileptic seizure while at a mall.    Id. at 489.    This seizure required medical

assistance, and plaintiff alleged that police officers "physically agitated and attacked him." Id. They took him into custody after "hogtying" him. Id. At his deposition, plaintiff testified that at the time he had the seizure he felt "dazed." Id. Leaving a restroom, plaintiff was approached by several individuals in uniform. Id. Plaintiff recalled that the officers had asked his name, and he asked to sit down. Id. He then suffered a seizure. Id. The next thing plaintiff could remember was "finding himself in hand- and foot-restraints, lying face down on a cot." Id. Defendants testified that plaintiff had threatened to swing at mall security and emergency medical services officers. Id. He swung at them as they approached him. Id. Plaintiff tried to kick a deputy who approached him, and continued to kick and fight when brought to the ground. Id. at 489-90. He pushed away a medical worker who attempted to obtain a blood-sugar reading. Id. at 490.

The court in Everson concluded that the police officer who participated in subduing plaintiff was entitled to qualified immunity. Id. at 498. The court noted that affidavits from personnel on the scene portray plaintiff as "a vocally abusive and physically agitated person who continued to kick and fight even when personnel tried to restrain him." Id. Plaintiff had no recollection of the incident, and testified that he "was dazed, groggy, and that he suffered 'strobe-light' sensations during this time." Id. He thus had no evidence to rebut the defendants' statements that he "posed an immediate threat to the safety of himself and emergency personnel." Id. Because of this lack of evidence to contradict defendants' claims that plaintiff was an immediate

threat, the court concluded that the officer on the scene was entitled to qualified immunity. Id.

The facts are different here, as evidence beyond the officers' recollections and reports exists. Like the plaintiff in Everson, plaintiff here cannot recall the facts of the incident. At his deposition, he testified that he could not remember anything that happened to him from the time he walked into the McDonald's until woke up sitting on the end a bed in the hospital. (Deposition of Richard Shultz, Exh. E to Defendants' Statement of Facts (Doc. 20) (hereinafter "Shultz Dep." at 26). There is evidence, however, in the forms of videotapes from the scene, that show plaintiff as much less of a threat to the officers than the plaintiff in Everson was. Those videotapes also show that Miller may have tasered plaintiff when he represented no threat to anyone. Under those circumstances, officers violated a clearly established right to be free of unreasonable force.

The case is more like Champion v. Outlook Nashville, Inc., 380 F.3d 893 (6th Cir. 2004). In that case, the court found that qualified immunity was unavailable to officers who had subdued an extremely agitated but unresponsive subject who suffered from severe autism and was unable to communicate. Id. at 903. The plaintiff died after officers handcuffed him and locked his legs together in a "hobbling device." Id. Testimony at trial indicated that officers continued to place their weight on plaintiff after subduing him in a way that eventually asphyxiated him and had sprayed pepper spray in his face after applying handcuffs. Id. The court concluded

"[n]o reasonable officer would have" continued to take such actions after a detainee had been subdued. Id. at 905. The court therefore denied defendant's qualified immunity claim.

Defendants are correct to argue that a police officer may use force to subdue a suspect resisting arrest. That force must be reasonable, however. As described above, plaintiff has pointed to evidence by which a jury could conclude that the force used by Defendant Miller and Defendant Kurtz used was excessive. A reasonable officer under the circumstances would know that the use of physical force that included repeatedly tasering a subject who had already been subdued and did not pose any threat violated the plaintiff's rights. As such, the qualified immunity defense is unavailable in these circumstances.

### C. Failure-to-Train Claim

Defendants argue that the court should grant them summary judgment on plaintiff's failure-to-train claim against the Police Department and the Borough of Carlisle. The Supreme Court has held that "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." City of Canton v. Harris, 489 U.S. 378, 389, (1989). Further, "[w]hen a plaintiff alleges that a municipality has not directly inflicted an injury, but has caused an employee to do so, stringent standards of culpability and causation must be applied to ensure that the municipality in a §

18

1983 suit is not held liable solely for the conduct of its employee." Reitz v. County of Bucks, 125 F.3d 139, 145 (3d Cir. 1997). These strict standards exist because "in enacting § 1983, Congress did not intend to impose liability on a municipality unless *deliberate* action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." Bd. of the County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 399 (1997).

In order to prevail on such a claim, "a plaintiff seeking to impose liability on a municipality under § 1983 [must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." Id. at 403. Liability attaches either to an official policy or to a "custom" that constitutes a "practice . . . so widespread as to have the force of law." Id. at 404. In the context of a motion to dismiss a plaintiff "must allege that a 'policy or custom' of [the defendants] was the 'moving force' behind a violation of his Eighth Amendment Rights." Grayson v. Mayview State Hosp., 293 F.3d 103, 107 (3d Cir. 2002) (citing to Brown, 520 U.S. at 404). When plaintiff asserts liability on the basis of a failure to train, "[a] plaintiff pressing a § 1983 claim must identify a failure to provide specific training that has a causal nexus with their injuries and must demonstrate that the absence of that specific training can reasonably be said to reflect a deliberate indifference to whether constitutional deprivations occurred." Reitz v. County of Bucks, 125 F.3d 139, 145 (3d Cir. 1997)

Plaintiff's expert, McCauley, also provides evidence to support the failure-to-train claim. McCauley contends that officers were not trained properly in "the tactics

19

of felony car stops, operational discipline and communications, or the use of force with a Taser." (McCauley Report at 22). Because officers frequently encounter "non-compliant" and "non-threatening" persons, not training officers in addressing such persons "reflects a deliberate indifference for the well-being of the suspect and the officers alike." (Id.). McCauley's report also focuses on what he terms were inadequate internal investigation procedures that followed the filing of plaintiff's complaint. (Id. at 24-5). McCauley considers this "failure . . . dangerous for citizens with mental health issues and the community at large as it reflects a deliberate indifference to detecting police misconduct." (Id. at 24). In the end, McCauley finds, "[t]he injuries and harms suffered by [plaintiff] were foreseeable and the consequences of the casual, informal, and grossly inadequate administration and operations of the CPD as previously discussed. Had the officers been adequately directed, supervised, and trained this incident reasonably would have been prevented." (Id. at 25-26).

The court finds that evidence exists by which a jury could conclude that plaintiff has met his burden on his failure-to-train claim. If the jury were to credit the opinions of plaintiff's expert, the jury could find that the training of officers on dealing with ill and mentally ill persons was so inadequate as to represent deliberate indifference to citizens' constitutional rights. As such, summary judgment is inappropriate on this claim and the defendants' motion will be denied.

**D. ADA Claim**

20

Plaintiff brings a claim under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., and the Rehabilitation Act, 29 U.S.C. § 794(a).  "Whether suit is filed under the Rehabilitation Act or under the Disabilities Act, the substantive standards for determining liability are the same."  McDonald v. Pennsylvania, 62 F.3d 92, 95 (3d Cir. 1995).  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the Services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

Plaintiff's Title II claim arises from police officers' actions in taking him into custody.  The parties disagree somewhat about the standard the court should apply in these circumstances.  Citing Title II, defendants argue that plaintiff must first prove that he suffered discrimination because of his disability.  Next, defendants insist that plaintiff must show "he was denied the benefits and services of the Borough." (Defendants' Brief at 16).  To prove this denial of services, defendants claim that plaintiff must show that the City failed to provide training to its officers regarding dealing with parties who had suffered seizures.  Plaintiff contends that the court should consider his claim a "reasonable accommodation" claim, "'whereby police properly investigate and arrest a person with a disability for a crime unrelated to the disability, but 'failed to reasonably accommodate the disabled person's disability in the course of investigation or arrest 'causing the person to suffer greater injury or indignity in that process than other arrestees.'" (Brief in Opposition at 16) (quoting

Gohier v. Enright, 186 F,.3d 1216, 1220-21 (10th Cir. 1999)).  According to plaintiff,

he could also prevail on this theory if he showed that the Department failed to train

its officers properly for dealing with disabled persons.

The Third Circuit Court of Appeals has not addressed the standard courts

should apply in addressing officers' use of force in the ADA context.  A claim under

Title II, however, requires as a general matter that a plaintiff in an ADA or RA matter

demonstrate that the discrimination he faced was by reason of his disability.  See

Chisolm v. McManimon, 275 F.3d 315, 324, 325 n. 9 (3d Cir. 2001) (quoting 42

U.S.C. § 12132, 29 U.S.C. § 794(a)); Chambers v. School District of Philadelphia

Board of Education, 587 F.3d 176, 189 (3d Cir. 2009) (finding that to prevail on an

RA or ADA Title II claim "(1) has a disability; (2) was otherwise qualified to

participate in [the program in question]; and (3) was denied the benefits of the

program or was otherwise subject to discrimination because of her disability.").[3]

Because the court finds that the question of whether plaintiff was discriminated

against because of his disability is dispositive, the court declines to address which

standard for evaluating claims like plaintiff's is appropriate.

The plaintiff has produced no evidence by which a jury could conclude that the

excessive force that plaintiff allegedly faced came because of his disability.  Plaintiff

testified that he could not remember the incident at all.  The security tapes from

McDonald's which he has submitted do not demonstrate that the force that officers

_____

[3]Defendants do not dispute that plaintiff is disabled.

used against plaintiff came because he was an epileptic.  (See Exh. R to Defendants' Statement of Facts (Doc. 18)).  Those tapes–which lack any sound–show plaintiff speaking with officers and EMTs for several minutes, standing up, and then being wrestled to the ground.  They do not provide any evidence that officers' actions were motivated by plaintiff's disability.

Corporal Miller testified that he first heard that Detective Kurtz was responding to the situation at the Walmart McDonald's over his car radio.  (Deposition of William D. Miller, Exh. C to Defendants' Statement (Doc. 18) (hereinafter "Miller Dep.") at 108).  The narrative on his car computer related that the call was initially related to a subject experiencing seizures, but that officers now considered intoxication a factor.  (Id. at 109).  Miller had never met plaintiff or been aware of him before that day.  (Id.).  Miller responded to the call because he found it "unusual" that Kurtz would take such a call.  (Id. at 110).  He took the presence of Kurtz, who was a detective, as evidence that "it was a serious call that could not wait for patrol officers."  (Id. at 111).  When Miller arrived at the McDonald's he spoke to two managers.  (Id. at 113).  The managers did not know what was wrong with plaintiff.  (Id. at 114).  No one Miller spoke with at the restaurant indicated that plaintiff had suffered a seizure.  (Id. at 115).  EMS personnel did not tell Miller that plaintiff had a seizure disorder.  (Id. at 149).  Plaintiff was unresponsive to Miller's questions.  (Id. at 116).  He answered Miller's questions with a single word: "Fine."  (Id. at 118).  When he first arrived, Miller suspected plaintiff may have been intoxicated.  (Id. at 120).  After

23

some investigation, he concluded the plaintiff was sober. (Id. at 121). Miller testified that he became concerned about plaintiff's behavior when he did not respond, since a "person having a normal response, normal behavior" would not have acted as plaintiff did. (Id. at 127). He eventually used force because he feared plaintiff could become a danger. (Id. at 134). In assessing this danger, Miller testified, he considered plaintiff's "resistance" to efforts to get him medical attention, as well as his mental state. (Id.).

Defendant Kurtz likewise heard from the dispatcher of "the possibility of a seizure or intoxicated person" at the scene to which he responded. (Deposition of Jeffrey Kurtz, Exh. D. to Defendants' Statement (Doc. 18) (hereinafter "Kurtz Dep.") at 45). He had no other information on the plaintiff. (Id.). No one told Kurtz "about Mr. Shutlz or his condition." (Id. at 51). He heard reports that plaintiff had fallen, but did not know the cause of his fall. (Id. at 68). Further, Kurtz testified that he had not examined plaintiff and "was not within the space that I could detect signs of immediate intoxication or some other illness or situation that was there." (Id. at 62). Based on the information he had, Kurtz testified, his "concern" was "not knowing what exactly his condition was at the time, intoxication, mental illness, medical problem, and also the fact that he had already been–had already fallen at least once, maybe more, I don't know, up to that point." (Id. at 68). Kurtz had no knowledge of plaintiff before the incident in question. (Id. at 71).

The court will grant the motion for summary judgment on this point. No

evidence in the record indicates that Kurtz or Miller used force because of plaintiff's disability.  While, as explained above, a jury could conclude from the evidence in the record that the force defendants use was excessive, no evidence indicates that the defendants used that force because plaintiff suffered from epilepsy.  Instead, the evidence indicates that defendants used that force because they perceived plaintiff as resisting them and as a danger to himself and others.  Any discrimination plaintiff may have face, then, was not "because of" his disability.  See Chambers, 587 F.3d at 189.

### E.  State-law Claims

#### i.  Assault and Battery

Defendants argue that they are entitled to summary judgment on plaintiff's claims for assault and battery under Pennsylvania law.  The force officers used to subdue plaintiff, defendants insist, was reasonable under the circumstances.  "'Assault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person.'" Renk v. City of Pittsburgh, 641 A. 2d 249, 293 (Pa. 1994) (quoting Cohen v. Lit Brothers, 70 A.2d 419, 421 (Pa. Super. Ct. 1950)).  Here, the alleged assault and battery occurred when a police officer performed an official duty.  Under such circumstances, "[a] police officer may use reasonable force to prevent interference with the exercise of his authority or the performance of his duty.  In making a lawful arrest, a police officer may use such

force as is necessary under the circumstances to effectuate an arrest.  The reasonableness of the force used in making the arrest determines whether the police officer's conduct constitutes an assault and battery."  Id.; see also Debellis v. Kulp, 166 F.Supp.2d 255, 280 (E.D. Pa. 2001) (finding that "[i]n making an arrest, a police officer "is justified in the use of any force which he believes to be necessary to defend himself or another from bodily harm while making the arrest.'") (quoting 18 Pa. Cons. Stat. § 508).

The court will deny defendants' motion on this claim.  As explained above in relation to plaintiff's Fourth Amendment claim, a jury could conclude that officers used more force than was reasonable under the circumstances to subdue the plaintiff and bring him into custody.  If a jury examines the videotapes in question and finds that plaintiff did not present any threat to the officers before they tasered him, that jury could find the use of force unreasonable and the defendants liable for assault and battery.

### ii.  Intentional Infliction of Emotional Distress

Defendants also argue that plaintiff's claims for intentional infliction of emotional distress should be dismissed.  Pennsylvania courts have never specifically adopted the tort of intentional infliction of emotional distress, but they have examined claims using the standards for that cause of action.  See Taylor v. Albert Einstein Med. Ctr., 754 A.2d 650, 652 (Pa. 2000) (finding that "[a]lthough we have never expressly recognized a cause of action for intentional infliction of emotional distress,

and thus have never formally adopted this section of the Restatement, we have cited the section as setting forth the minimum elements necessary to sustain a cause of action."). According to the Pennsylvania Supreme Court, the tort can be described as: "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." <u>Kazatsky v. King David Memorial Park</u>, 527 A.2d 988, 993 (Pa. 1987) (quoting RESTATMENT (SECOND) OF TORTS, § 46(1)). To be "extreme and outrageous," such conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of human decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." <u>Strain v. Ferroni</u>, 592 A.2d 698, 704 n.4 (Pa. Super. Ct. 1991). A plaintiff cannot recover for such conduct, however, "without expert medical confirmation that the plaintiff actually suffered the claimed distress." <u>Id.</u> at 995; <u>see also</u>, <u>Cassell v. Lancaster Mennonite Conference,</u> 834 A.2d, 1185, 1189 n. 3 (Pa. Super. Ct. 2003) (holding that "[e]xpert medical testimony is necessary to establish that a plaintiff actually suffered the claimed emotional distress.").

The court will also deny summary judgment on this claim. If a jury finds that the defendants' deliberately used extreme force to subdue a subject suffering from physical distress and not resisting officers' physical control they could find that such conduct goes beyond all bonds of human decency. <u>See, e.g.</u>, <u>Chuy v. Philadelphia Eagles Football Club</u>, 595 F.2d 1265, 1275–76 (3d Cir. 1975) (knowingly

disseminating to the press false medical information that indicated plaintiff was suffering a fatal disease amounted to extreme and outrageous conduct); Banyas v. Lower Bucks Hospital, 437 A.2d 1236, 1239 (Pa. Super. Ct. 1981) (intentionally propagating a false statement that plaintiff was sole cause of another's death was extreme and outrageous); Bowersox v. P.H. Glatfelter Co., 677 F. Supp. 307, 311-312 (M.D. Pa. 1988) (finding that extreme and outrageous conduct did not appear solely because sexual harassment existed, but because retaliation was also present). Defendant also argues that plaintiff has not provided any medical expert testimony to support his claim that defendants' actions caused him actual injury. Evidence in the record detailed above, however, indicates that plaintiff's doctors have provided him with both physical and psychological treatment related to his injuries from this incident. Plaintiff testified that he began seeing a psychiatrist in November 2006 as treatment for depression, and that the incident at the McDonald's was one of the subjects of his treatment with her. (Shultz Dep. at 34-5). While plaintiff cannot prevail on such a claim based solely on his own testimony, the evidence read in the light most favorable to the plaintiff indicates that a doctor could provide evidence to support plaintiff's claims. If a jury credits this evidence, plaintiff could demonstrate through competent medical evidence that he suffered emotional distress from defendants' actions. Summary judgment on this claim is therefore inappropriate.

**Conclusion**

For the reasons stated above, the court will grant the defendants' motion in

part and deny it in part.  The court will grant the motion with respect to plaintiff's claims brought pursuant to the ADA and RA, and deny it in all other respects.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RICHARD A. SHULTZ** | : | **No. 1:08cv1896** |
| **Plaintiff,** | : | |
| | : | **(Judge Munley)** |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CARLISLE POLICE DEPARTMENT;** | : | |
| **CORPORAL WILLIAM D. MILLER;** | : | |
| **OFFICER JEFFRY KURTZ;** | : | |
| **UNKNOWN OFFICERS AND** | : | |
| **AGENTS; and** | : | |
| **THE BOROUGH OF CARLISLE,** | : | |
| **Defendant** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

<u>**ORDER**</u>

**AND NOW**, to wit, this 7th day of April 2010, the defendants' motion for summary judgment is hereby **GRANTED** in part and **DENIED** in part as follows:

1.  The motion is **GRANTED** with respect to plaintiff's claims brought pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., and the Rehabilitation Act, 29 U.S.C. § 794(a); and

2.  The motion is **DENIED** in all other respects.

       **BY THE COURT:**

       <u>**s/ James M. Munley**</u>
       **JUDGE JAMES M. MUNLEY**
       **UNITED STATES DISTRICT COURT**